Filed 6/30/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040632 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS131878A) |
| v. | |
| LESLIE STEPHENY CARREON, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

Defendant Leslie Stepheny Carreon and her young son were staying in a converted garage unit of a residence leased by probationer Naomi Anderson. Law enforcement officers arrived to conduct a probation search of the residence. The garage unit was accessible from inside the house through a laundry room and a closed but unlocked door. While the officers conducted a protective sweep, they had defendant remove her young son from a bed in the converted garage unit and then had the occupants, including the probationer, wait in the kitchen while officers searched the house. The probation officer who entered the garage unit to search it believed it was defendant's room and not the residence of the female probationer he had come to search. In that room he found a pay/owe sheet in a drawer and a plastic bag containing what appeared to be shards of methamphetamine inside a purse. The crystalline powder tested presumptively positive for methamphetamine. Defendant was charged with possession of methamphetamine for

sale (Health & Saf. Code, § 11378) while released on bail (Pen. Code, § 12022.1).[1] She was on bail and awaiting sentencing in two earlier cases in which she was convicted by no contest pleas of two commercial burglaries, one a felony.

After defendant's suppression motion was denied, she entered a no contest plea to possessing methamphetamine for sale while released on bail. In all three cases, the court suspended imposition of sentence and placed defendant on formal probation for three years with a number of conditions, including prohibiting defendant's possession of tools used for the express purpose of facilitating a burglary or theft.

On appeal defendant seeks further review of her suppression motion and challenges one probation condition. The Attorney General, while seeking to justify the search, has no objections to modifying either the burglary tool probation condition or an order requiring defendant to register as an offender. We will conclude that a probation search condition of the residence of a female probationer, without more, did not authorize law enforcement officers to look into a purse or drawers located in a separate living unit. Because the suppression motion and the section 995 motion challenging its denial should have been granted, we will reverse the judgment.

## II. TRIAL COURT PROCEEDINGS

### A. EARLIER CHARGES

On April 23, 2013, defendant and her boyfriend took unpurchased merchandise from a Kohl's store and were apprehended when they attempted to take speakers from a Target store. This led to two felony charges of commercial burglary and two misdemeanor charges of petty theft (§ 484, subd. (a)) against defendant in Monterey County Superior Court Case No. SS130812B.

---

[1] Unspecified section references are to the Penal Code.

2

While released on bail, defendant was apprehended after taking speakers from Target on June 10, 2013.  This led to a third charge of commercial burglary in Monterey County Superior Court Case No. SS131200A, this crime occurring while she was on bail.

On August 29, 2013, defendant signed no contest pleas in both of these cases, agreeing to felony probation and pleading no contest to one felony count of commercial burglary in Case No. SS130812B and one amended misdemeanor count of commercial burglary in Case No. SS131200A.  The court referred the cases for a pre-sentence probation report due in October 2013.

## B. *THE COMBINED SUPPRESSION/PRELIMINARY HEARING*

On September 20, 2013, defendant was charged by complaint with possessing methamphetamine for sale while out on bail two days earlier.

Defendant scheduled a motion to suppress evidence (§ 1538.5) concurrent with the preliminary hearing in the case.  Defendant requested suppression of all observations by the officers during and after her detention and search, including any statements she made, and all evidence located during the search, "including but not limited to the methamphetamine, alleged pay/owe sheets, and text messages seized from [defendant's] person or property."

At the hearing, defendant called no witness.  Two officers testified as follows.

Based on information that probationer Naomi Anderson was dealing drugs, officers set out to perform a probation search of a location in Salinas that Anderson had informed the probation department was her residence.  The search was performed by several probation officers including Monterey County Probation Officer Kevin Christian and also a team from the Peninsula Regional Violence and Narcotics Task Force (PRVNT) including Seaside Police Detective Frank Salzillo.  No document recording Anderson's probation conditions was produced at the hearing, but Officer Christian recalled that the condition authorized searching Anderson, "[a]ny room . . . that she has control over or access to, any vehicles that she has control over or access to."

After officers knocked at the door of the residence, defendant answered and opened the door. When Christian entered, he saw Anderson sitting at a kitchen counter. Salzillo was one of the last officers in the stack to enter the residence. Their first priority was a protective sweep of the rooms to secure potentially hostile occupants. The officers had defendant and Anderson sit in the kitchen as they swept and searched the house. Anderson told Salzillo that it was the house of her and her boyfriend and that defendant was staying in the converted garage. Salzillo stated, "once she told me that it was her house, I assumed she had access to the whole house unless a door was locked." Salzillo believed that Anderson rented the house. He did not ask if defendant was renting a room from the probationer.

According to Christian, "we try every door in the house when we do a search. If the door is not locked, the probationer has access." The house had three bedrooms and the converted garage and another room accessible only from the outside that appeared to be inhabited. Salzillo recalled that one bedroom was not swept or searched because the door was locked. Anderson said it was her son's room and she did not have a key. Officers observed no one present in that room.

The garage was accessible from inside the house through a door off the laundry room. Salzillo and another PRVNT officer were the first to sweep that room for safety. Salzillo opened the door, which was closed but not locked. The room was dark. Defendant told Salzillo that her young son was in bed in that room and Salzillo had her remove him.

Salzillo and Christian participated in searching Anderson's bedroom. Neither was asked whether he found or searched a purse belonging to Anderson.

The interior door to the garage was open when Christian entered it. Christian and Salzillo believed that the converted garage was defendant's room before Christian searched it. Christian was unaware of any tenancy arrangements in the house. He noticed a purse on top of something a couple of feet inside the room. He did not say its

4

contents were in plain view. He searched other areas before opening up the purse, which was not fastened or otherwise closed. Christian did not ask the occupants whose purse it was and he was not asked at the hearing whose purse he thought it was. Inside the purse he found a plastic bag containing shards of what appeared to methamphetamine, which a test by Salzillo presumptively confirmed. Salzillo recalled that Christian also found a pay/owe sheet in a plastic drawer within a couple of feet of the purse.

Neither officer saw signs of restricted access to the converted garage or noticed if there was a lock on the door. Neither officer asked defendant or Anderson who had access to the garage or whether Anderson had a key. There was no testimony about an occupant objecting to any stage of the search.

Christian testified that he had participated in another search where a son had put a pound of cocaine in his father's room and shut the door when the officers arrived. Salzillo stated: "[I]t's a common practice for us, especially when it's a drug related search, you know, in this type of household, that I would consider it more of a flop house, where there's in and out—people in and out of the dwelling, primarily drug users. And it's been common practice that they will, you know, stash drugs in other party's rooms to deter law enforcement. So based on that, the door was unlocked, which gave us access to that room."

After the search, defendant was arrested on a misdemeanor warrant and for possessing methamphetamine with intent to sell. After Salzillo advised her of her rights, she said that the methamphetamine was hers and that she had turned from shoplifting to selling methamphetamine to provide for her child. Neither officer was asked if Anderson was arrested for constructive possession of the methamphetamine or conspiring to possess it.

At a continued hearing, having considered the parties' briefing and oral argument, the magistrate denied defendant's motion to suppress and held her to answer on the charge of possession for sale of a controlled substance in Monterey County Superior

Court No. Case SS131878A. The magistrate reasoned: "So what the Court finds in this matter is that the entry into the home was a probation search. It was based on reasonable suspicion of drug activity. There was information that the officers had, probation officers, and that the [PRVNT] team had, that there was drug activity at the residence. And as part of Ms. Anderson's terms of probation and her agreeing to the benefit of probation, she gave up her right to search and seizure. And the probation search allows search of all areas in—that was authorized under the terms of probation. So the question is was the search of all the areas of the house, including the garage that had been converted into a living space, a bedroom, authorized by the probation conditions. So Ms. Anderson, by accepting to be on probation, consented to the search terms. The search terms did include the right to search her home and her vehicle, and that was stated by Officer Christian. [¶] So the Court does find that she was on probation terms; that it was reasonable for the officers to go in and do the search. The law provides that—actually, when she is on probation, she's consented to these search terms. And the law provides when a consent to search—when there is a consent to search a home, it includes all the areas over which there is sole or joint control. And the testimony that was borne out in this case indicated by particularly Officer Christian that Anderson did have access to the garage and the room, and she did have joint control of that area. Officer Salzillo's testimony also confirmed this, because Officer Salzillo says that Anderson told him that she controlled the house. She had the lease for the house and was the primary person responsible for it. [¶] . . . I find that the facts in this matter show that Ms. Anderson was the one in joint control of the entire residence, including the garage; that there was no prohibition for anyone, including Ms. Anderson, to go into the garage/bedroom area, and as [] a result, it was available for law enforcement to search."

### C. *THE MOTION TO SET ASIDE THE INFORMATION*

After defendant was arraigned on the drug charge, she filed a motion to set aside the information under section 995 which reiterated her suppression motion. The

6

prosecutor filed opposition summarizing the evidence as follows (omitting bullet points and citations to the reporter's transcript). "Probationer [Naomi Anderson] reporting 267 Chaparral as her residence to Probation. [¶] Probationer's statement to Detective Salzillo that 267 Chaparral residence is 'my house.' [¶] Unlocked status of converted garage door in probationer's house. [¶] Absence of physical barriers limiting access to converted garage to other residents of 267 Chaparral. [¶] Absence of signage notifying access limitation to converted garage to other residents of 267 Chaparral. [¶] Absence of statements to PRVNT-Probation that probationer lacked access to the converted garage before they made entry. [¶] Officer Christian's experiences on similar searches with probationers hiding drugs in rooms that others occupy that the probationers can access. [¶] Detective Salzillo's experiences on hundreds of similar searches informing his belief that 267 Chaparral was a 'flophouse' rife with drug users, people are commonly 'in and out,' and stashing drugs in other's rooms is a common practice."

The motion was argued based on the evidence presented at the suppression motion. The court took the matter under submission and denied the section 995 motion by a written ruling that relied on the prosecution's summary of the evidence in concluding that "the officer had a reasonable belief that the probationer had at least access to the garage converted for sleeping, and the purse, if not joint control over same."

### D. SUBSEQUENT PROCEEDINGS

After defendant's section 995 motion was denied, on January 7, 2014, she entered a no contest plea to the charge of possession for sale and admitted she was out on bail during the offense after being advised that "you'll be required to register as a drug offender pursuant to 11590 of the Health and Safety Code."[2]

---

[2] The minute order for this hearing did not record advice about drug offender registration, instead stating she was advised: "Conviction of the offense would require registration pursuant to PC 290 as a sex offender."

*(Continued)*

7

On January 21, 2014, the court suspended imposition of sentence and granted probation in all three cases as follows: in Case No. SS131878A, formal probation for three years subject to various fines and conditions and registration as a drug offender; in Case No. SS130812B, formal probation for three years subject to various conditions, fines, fees, and assessments, including the condition, "You are not to possess tools used for the express purpose of facilitating a burglary or theft such as pry bars, screw drivers, pick lock devices, universal keys or implements or other such devices without the express permission of your supervising probation officer"; in Case No. SS131200A, formal probation for three years subject to various fines, fees, and assessments, and "very similar" conditions, including prohibited possession of tools for the express purpose of facilitating a burglary or theft.

## III. ANALYSIS

### A. STANDARD OF REVIEW

When a warrantless search is based on consent by a third party, it is the prosecution's burden in the trial court to establish the third party's apparent common authority over the area or property searched. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181; *People v. Escudero* (1979) 23 Cal.3d 800, 806; *In re Scott K.* (1979) 24 Cal.3d 395, 405.) On appeal we give deferential review to the fact-finder's determinations, after assessing witness credibility and resolving any evidentiary conflicts, of the historical facts of what happened, including what a searching officer did, observed, thought, and believed. (Cf. *People v. Tully* (2012) 54 Cal.4th 952, 979; *Ornelas v. U.S.* (1996) 517 U.S. 690, 696, 699 (*Ornelas*).) When an appeal challenges the denial of a section 995

The Attorney General concedes this error in the minute order and does not oppose defendant's request that we order the minute order corrected to reflect the court's actual advice.

8

motion that itself challenged a magistrate's denial of a section 1538.5 motion, we resolve any evidentiary conflicts and credibility questions in support of those express and implicit factual findings *by the magistrate* that are supported by substantial evidence. (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244-1245; cf. *People v. Laiwa* (1983) 34 Cal.3d 711, 718; *People v. Superior Court* (*Cooper*) (2003) 114 Cal.App.4th 713, 717.)

However, on appeal we independently determine whether the conduct involved in a search was constitutionally reasonable, "whether the[] historical facts, viewed from the standpoint of an objectively reasonable police officer," justified the search. (*Ornelas*, *supra*, 517 U.S. at p. 696; *People v. Hughes* (2002) 27 Cal.4th 287, 327.) "The constitutional precept of 'reasonableness' as to searches and seizures is not a 'fact' which can be 'found' or not found in any given case. Rather, it is a standard, a rule of law, external, objective and ubiquitous, to be applied to the facts of all cases." (*People v. Manning* (1973) 33 Cal.App.3d 586, 599; contra, *People v. Tidalgo* (1981) 123 Cal.App.3d 301, 307.)

The Attorney General cites *People v. Ermi* (2013) 216 Cal.App.4th 277, 281, for the proposition, "[t]he question of joint access to control over a room is a factual one reviewed for substantial evidence." However, the issue critical to consent is not whether the consenting party had actual access, but whether it was "objectively reasonable for the searching officer to believe that the person giving consent had authority to do so . . . ." (*People v. Jenkins* (2000) 22 Cal.4th 900, 974 (*Jenkins*).) What is objectively reasonable is a question of law, not fact.

## B. *THE SCOPE OF THE PROBATION SEARCH*

It is unquestioned that Anderson's probation search condition authorized officers to enter and search her residence. (*People v. Woods* (1999) 21 Cal.4th 668, 675-676 (*Woods*).) "A search conducted pursuant to a valid consent does not violate the Fourth Amendment unless the search exceeds the scope of the consent." (*People v. Bravo* (1987) 43 Cal.3d 600, 605.)

"[A]t least two questions are presented when the state seeks to justify a warrantless search by relying upon the consent of a third party who is the occupant of the premises searched:  whether the third party had authority to consent to the search, and whether the scope of the consent given included the object or container that was searched.  In the resolution of these questions . . . the state may carry its burden by demonstrating that it was objectively reasonable for the searching officer to believe that the person giving consent had authority to do so, and to believe that the scope of the consent given encompassed the item searched."  (*Jenkins*, *supra*, 22 Cal.4th 900, 974.)

"The 'common authority' theory of consent rests 'on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' " (*Woods*, *supra*, 21 Cal.4th at p. 676, quoting *United States v. Matlock* (1974) 415 U.S. 164, 172, fn. 7.)  A person may assume the risk of search by associating with a probationer without knowing his or her associate is on probation.  What is relevant is the searching officer's state of mind.  (*People v. Schmitz* (2012) 55 Cal.4th 909, 923 (*Schmitz*).)  Officers who are aware of a probation search condition (*People v. Robles* (2000) 23 Cal.4th 789, 800) "generally may only search those portions of the residence they reasonably believe the probationer has complete or joint control over." (*Woods*, *supra*, 21 Cal.4th at p. 682.)  "The sanctity of the home demands recognition that persons living with a probationer or parolee 'retain valid privacy expectations in residential areas subject to their exclusive access or control, so long as there is no basis for officers to reasonably believe the probationer has authority over those areas.' " (*Schmitz*, *supra*, 55 Cal.4th at p. 920, quoting *People v. Robles, supra,* at p. 798.)

What is, or reasonably appears to be, within a probationer's common authority will depend on the specific factual setting of each search.  Searching officers are entitled

10

to rely on appearances. In searching a probationer's residence, officers are not required either to inquire about the ownership of or access rights to each item on the premises or to believe the probationer's statements on this topic. (Cf. *People v. Britton* (1984) 156 Cal.App.3d 689, 701, disapproved on another ground by *People v. Williams* (1999) 20 Cal.4th 119, 135; *People v. Boyd* (1990) 224 Cal.App.3d 736, 749 (*Boyd*).)

In this case, the searching officer believed he was searching defendant's bedroom. On appeal, the parties argue about whether the probationer had joint control over or joint access to defendant's bedroom without citing any precedent involving landlords or overnight guests.

In *People v. Superior Court* (*Walker*) (2006) 143 Cal.App.4th 1183, this court reviewed several cases involving a landlord's authority. "[A] landlord may not give valid third-party consent to a police search of a house rented to another. [Citations.] The same principle applies to prevent a finding of third-party consent where the leased property is an apartment unit [citation], a room in a boarding house [citation], a garage [citation], or a locker [citation]. Likewise, a hotel clerk may not consent to the search of an occupant's room. [Citations.]" (*Id.* at p. 1200.)

Even without a formalized tenancy, an overnight guest in another's residence has some reasonable expectations of privacy. "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." (*Minnesota v. Olson* (1990) 495 U.S. 91, 98 (*Olson*).) "We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home. [¶] From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. . . . [¶] . . . The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of

11

privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household." (*Id.* at pp. 98-99.) *Olson* determined that it violated the Fourth Amendment rights of an overnight guest for the police to arrest him after making a warrantless, nonconsensual entry into a duplex. (*Id.* at p. 93.) *Olson* was a seizure case and there was no separate discussion of a guest's freedom from warrantless searches.

In this case the searching officer, Christian, and Detective Salzillo both believed the converted garage was defendant's room in the probationer's residence before Christian searched it. We conclude that this subjective belief was objectively reasonable considering (a) the probationer had said so, (b) the probationer had a separate bedroom, and (c) defendant's child was in bed in the room when the officers arrived.

The question is what "widely shared social expectations" govern defendant's privacy in this converted room. (*Georgia v. Randolph* (2006) 547 U.S. 103, 111.) It is significant that the probationer was not merely an unrelated adult housemate, but apparently the resident leaseholder of the premises, as the magistrate found. Though property law is not determinative, "when the person who consents to the search enjoys a possessory interest that the defendant does not share in the premises searched . . . , the authority of a third party to consent to a search may be established." (*Jenkins*, *supra*, 22 Cal.4th 900, 979.)

On appeal, both sides present colorful characterizations of the living arrangement that are not supported by the testimony. Defendant repeatedly characterizes the converted garage as her "private room," "a private rented room," "a private living space within her rented room," and her "closed private bedroom." However, there was no testimony that defendant was paying rent for the room and the magistrate did not so find. On the other hand, while the room was not posted "private," it was a separate bedroom inhabited by defendant and her child, and its door was closed, though not locked, until it was opened for the protective sweep.

12

The Attorney General emphasizes that the probationer told the officers it was "her" house and repeats the opinion of Detective Salzillo that it was a "flop" house with drug users going in and out. While the search did reveal drugs in the house, as defendant points out, Salzillo did not cite any pre-search evidence supporting this opinion. A search must be justified by information then available to the searching officers, not by evidence discovered by the search. (*People v. Harris* (1975) 15 Cal.3d 384, 392.) There is no indication that the magistrate relied on this opinion, though the superior court did so in denying the section 995 motion.

The presence of an overnight guest should prompt a searching officer to pause and consider the guest's privacy expectations before intruding into an area assigned to the guest. In our opinion, it flouts widely held social expectations to define joint access as simply having the physical ability to open a door, walk into a room, and open drawers.

"Whether a woman has a legitimate privacy interest in the contents of her purse depends in part on where the purse is located." (*People v. Shepherd* (1994) 23 Cal.App.4th 825, 829 [woman had no reasonable expectation of privacy in purse left in stolen car].) Purses have been recognized to be essentially personal and private containers. (*People v. Veronica* (1980) 107 Cal.App.3d 906, 909 (*Veronica*) ["In this case . . . there was simply nothing to overcome the obvious presumption that the purse" in a parolee's residence belonged to his wife, not to him].)

Defendant also invokes *People v. Baker* (2008) 164 Cal.App.4th 1152 (*Baker*). In a car stopped for speeding were the male parolee driver and a woman who was sitting in the front passenger seat with a purse at her feet. (*Id.* at p. 1156.) The court acknowledged that "a purse has been recognized as an inherently private repository for personal items" (*id.* at p. 1159) and "is not generally an object for which two or more persons share common use or authority." (*Id.* at p. 1160.) Without more evidence, the appellate court concluded "there is nothing to overcome the obvious presumption that the purse belonged to the sole female occupant of the vehicle who was not subject to a

13

parole-condition search." (*Ibid.*) On the limited facts, "there could be no reasonable suspicion that the purse belonged to the driver, that the driver exercised control or possession of the purse, or that the purse contained anything belonging to the driver." (*Id.* at p. 1159.)[3]

The Attorney General seeks to distinguish *Veronica* and *Baker* because defendant and the probationer were both female, so "the police could reasonably believe that the 'distinctly female' item—the purse, was [the probationer's], when they discovered it in [defendant's] room—a room [the probationer] had joint control over or access to." However, there was no testimony that any officer subjectively entertained this belief and we do not consider it objectively reasonable. No special circumstances indicated that the probationer was keeping her purse, or one of them, in defendant's bedroom, instead of her own bedroom, which the officers had already searched. There was no evidence that the probationer had recently left defendant's room or that she had a particularly intimate relationship with defendant. Had the officers found two purses near defendant and the probationer in the kitchen where they were sitting, there may have been some ambiguity about the ownership of each purse, but the purse in question was located in what the officers recognized to be the female defendant's bedroom.

We find guidance in *People v. Daniels* (1971) 16 Cal.App.3d 36 (*Daniels*), where a mother specifically consented to a search of a bedroom in her house where her adult son

---

[3] In some cases, the presumption of female ownership has been overcome and appellate courts have upheld purse searches based on evidence that the purse owner's boyfriend, a parolee or probationer, had joint control over or at least joint access to the contents of the purse. (*People v. Smith* (2002) 95 Cal.App.4th 912, 916, 919 [facts indicated either that male probationer and his girlfriend were "sharing in a criminal enterprise" or that she knew he was using the purse "as a repository"]; *Boyd*, *supra*, 224 Cal.App.3d 736, 750-751 ["the gender neutral handbag" was "owned or controlled by one or both of the [male] parolees."]; *People v. Ermi*, *supra*, 216 Cal.App.4th 277, 281.) Those cases involve different fact patterns than presented here.

14

was staying rent-free.  (*Id.* at p. 42.)  While the son was in the living room, the police entered the bedroom and opened dresser drawers and a suitcase.  (*Ibid.*)  The court concluded that while the mother's "consent to search covered not only the bedroom as such but also the furniture therein, i.e., the dresser, dresser drawers and bed" (*id.* at p. 45), it did not justify opening a suitcase found in that bedroom.  (*Id.* at pp. 42-43, 45; cf. *People v. Koury* (1989) 214 Cal.App.3d 676, 690 [occupant of house had a legitimate expectation of privacy in a closed pouch, a locked briefcase, and a locked suitcase located in a bedroom].)  While the purse in our case was located in the probationer's residence, the available evidence indicated it was not her purse and there was no evidence of the probationer's actual access to or control over the contents of the purse.

As to the earlier search of what was apparently a dresser drawer in defendant's bedroom, we consider the facts distinguishable from *Daniels*, *supra*, 16 Cal.App.3d 36, where the court concluded the mother had actual or at least apparent authority to consent to a search of her adult son's bedroom and dresser drawers in the bedroom.  (*Id.* at pp. 42-43.)  "The evidence supports the inference . . . defendant did not have exclusive possession or control over the bedroom which he was permitted to use; and his mother, by virtue of her ownership and the circumstances in the case, had the right to enter and search the bedroom at will."  (*Id.* at p. 43.)  The court noted that the defendant, who was present, did not object to the search.  (*Id.* at pp. 44-45.)

In our case, while the magistrate found that the probationer was the leaseholder, there was no evidence of a family relationship or equivalent familiarity between the probationer and defendant.  The probationer did not expressly consent to searching defendant's bedroom or otherwise manifest the same level of authority over the converted garage as did the mother in *Daniels*.  We conclude that the prosecution did not present sufficient evidence to justify a warrantless search or an objectively reasonable belief that the probationer had authority over the contents of either the drawers or the purse in defendant's bedroom.  We see no basis for upholding the denial of the section 995 motion

15

and conclude that it should have been granted.  (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 897 [denial of section 995 motion may be upheld "if there is substantial legally obtained evidence to support the information . . . ."].)

## C.  *VALIDITY OF PROBATION CONDITION REGARDING BURGLARY TOOLS*

On appeal defendant also challenges a probation condition that arose from her two convictions of commercial burglary, which we are not reversing.  That condition states: "You are not to possess tools used for the express purpose of facilitating a burglary or theft such as pry bars, screw drivers, pick lock devices, universal keys or implements or other such devices without the express permission of your supervising probation officer." She contends it must be modified to include a knowledge element, specifically to prohibit possessing burglary tools "knowingly."

While defendant did not object to this condition below, a reviewing court may examine the constitutionality of a probation condition, even if not challenged in the trial court, if the question can be resolved as a matter of law without reference to the sentencing record.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 888-889.)  The Attorney General has conceded that modification would be appropriate, relying on a decision by this court in which the California Supreme Court has subsequently granted review. (*People v. Povio* (2014) 227 Cal.App.4th 1424, review granted October 15, 2014, S220685.)

This is not a situation in which it is possible to infer that a probation condition has the same implicit mental element as the penal statutes it was written to enforce.  (E.g., *People v. Kim* (2011) 193 Cal.App.4th 836, 843, 847; *People v. Rodriguez* (2013) 222 Cal.App.4th 578, 593.)  The challenged condition appears to derive from part of section 466, a lengthy statute that makes three kinds of conduct a misdemeanor.  It prohibits (a) possessing a burglary tool with the intent to burglarize, (b) knowingly

16

creating such a tool without a property owner's authorization, and (c) creating such a tool with the knowledge or at least a reason to believe it will be used in a crime.[4]

In construing related section 466.5, which prohibits use of a motor vehicle master key, *People v. Valenzuela* (2001) 92 Cal.App.4th 768 concluded that since the statute already has an explicit specific intent element, it need not be construed like weapon possession statutes as also requiring constructive knowledge of the nature of the item. (*Id.* at pp. 778-779.) The court said of section 466, "the elements of the crime described in that section are possession and intent. There is no requirement that the defendant know that the screwdriver is a screwdriver, or the master key is a master key, or even that a particular tool is a slim jim. In other words, the possession of each of the items is lawful until it is intended to be used feloniously." (*Valenzuela*, *supra*, at p. 777; *People v. Southard* (2007) 152 Cal.App.4th 1079, 1084-1085 [elements of § 466 include possession of tools with the intent to use to use them for breaking and entering].)

The challenged probation condition does not include any of the express mental elements found in section 466, neither specific intent, actual knowledge, nor constructive knowledge. This condition may be made constitutionally clear by including either an express knowledge element (e.g., "do not possess a tool that you know or reasonably

---

[4] Section 466 makes it a misdemeanor to have "upon him or her in his or her possession a picklock, crow, keybit, crowbar, screwdriver, vise grip pliers, water-pump pliers, slidehammer, slim jim, tension bar, lock pick gun, tubular lock pick, bump key, floor-safe door puller, master key, ceramic or porcelain spark plug chips or pieces, or other instrument or tool *with intent feloniously to break or enter* into any building, railroad car, aircraft, or vessel, trailer coach, or vehicle as defined in the Vehicle Code, or who shall *knowingly* make or alter, or shall attempt to make or alter, any key or other instrument named above so that the same will fit or open the lock of a building, railroad car, aircraft, vessel, trailer coach, or vehicle as defined in the Vehicle Code, without being requested to do so by some person having the right to open the same, or who shall make, alter, or repair any instrument or thing, *knowing or having reason to believe that it is intended to be used in committing a misdemeanor or felony . . . .*" (Our italics.)

17

should know is used to facilitate a burglary or theft") or an express intent element (e.g., "do not possess a specified tool with the intent to commit a burglary or theft" or "do not possess a specified tool with the purpose of committing a burglary or theft"). The latter conforms more closely to section 466. As this case is being remanded for other reasons, the trial court will have an opportunity to remove the vagueness from this condition.

## IV. DISPOSITION

The judgment is reversed. The court shall enter an order granting defendant's section 995 motion in case SS131878A. The minute order of January 7, 2014 shall be corrected to state, "conviction of the offense would require registration pursuant to Health and Safety Code section 11590." The court is directed to modify the probation condition as indicated above.

_____
                    RUSHING, P.J.

WE CONCUR:

_____
           PREMO, J.

_____
           MÁRQUEZ, J.

***People v. Carreon***
**H040632**

19

Trial Court:                                   Monterey County
                                               Superior Court No.:  SS131878A


Trial Judge:                                   The Honorable Julie R. Culver


Attorney for Defendant and Appellant           Monica Stoner
Leslie Stepheny Carreon:                       under appointment by the Court
                                               of Appeal for Appellant


Attorneys for Plaintiff and Respondent         Kamala D. Harris
The People:                                    Attorney General

                                               Gerald A. Engler,
                                               Senior Assistant Attorney General

                                               René A. Chacón,
                                               Supervising Deputy Attorney General

                                               Bruce Ortega,
                                               Deputy Attorney General


*People v. Carreon*
**H040632**